Bertie L. Lomas, Petitioner *v.* Board of School Directors of Northwestern Lehigh School District, Respondent.

Argued March 5, 1982, before Judges ROGERS, CRAIG and MACPHAIL, sitting as a panel of three.

*Thomas E. Weaver, Jr., Weaver, Mosebach, Piosa & Hixson, P.C.,* for petitioner.

*John E. Freund, III, King, McCardle & Herman,* for respondent.

OPINION BY JUDGE ROGERS, May 7, 1982:

Bertie L. Lomas here seeks review of the action of the Board of School Directors of the Northwestern Lehigh School District, affirmed by the Secretary of Education,[1] demoting her from the position of elementary school principal to that of classroom teacher.

The factual circumstances attending this demotion, which we will explore in some detail below, are contained in fourteen volumes of notes of testimony made before the board during thirteen public sessions conducted between the end of January and the end of February, 1980. Mrs. Lomas commenced her employment with the school district in September, 1974, as the principal of the Weisenberg Elementary School. Prior to the 1974-1975 school year the administrative duties at Weisenberg were performed by a group of six teachers holding the title of grade chairperson or team leader who, through an elected team coordinator, reported to the Superintendent of Schools, Dr. Harry Burger. From the superintendent's annual evaluations introduced as exhibits, it is clear that at the time of those evaluations he believed Mrs. Lomas' performance as principal during the first five years of her tenure to have been satisfactory on the whole. Criticism contained in the evaluations of her conduct during this period is universally mild although a re-

---

[1] Teacher Tenure Appeal No. 5-80.

peated theme in this regard is the superintendent's concern that Mrs. Lomas had not done all that was necessary to coordinate the program at Weisenberg with that of the other district elementary school— Northwestern Elementary—and that she ought to have more actively included other professional employees at Weisenberg in her process of decision making and in the development of curriculum and program.

These criticisms, although apparently of no great moment to the evaluator when made, proved to be prescient in the 1979-1980 school year. During the first week of the school year, in September, 1979, Mrs. Lomas informed the teaching staff at Weisenberg that the grouping of students for reading instruction, in past years accomplished by the teachers in the first two weeks of classes, had been done by Mrs. Lomas and her secretarial staff during the summer months. Mrs. Lomas also stated at this time that the grouping procedure used and the level of instructional materials assigned to each group constituted a marked departure from past practice and might be expected to result in a gap in the pedagogical exposure of some students and the resultant need for additional efforts on the part of the reading teachers in order to supply certain skills and vocabulary words otherwise omitted. These measures were necessary, in Mrs. Lomas' view, in order to create in students the expectation that great educational progress was possible; an expectation that was then hoped to bring about its own fulfillment. The particular method chosen to achieve this result was both simple and direct: the regrouping of students and the reassignment of instructional materials so as to ensure that each pupil was instructed at the highest level of which he or she was capable as indicated by standardized test scores and previous achievement.

In the next several weeks the teachers experienced, as they described it, insurmountable difficulties in the use of the assigned materials with their reading groups. In many instances the materials were so greatly in advance of the students' level of actual ability that no progress could be made.

Mrs. Lomas was then approached by a number of teachers with regard to these problems and while she was willing, albeit reluctantly, to permit individual pupil reassignments and even, on petition of the entire first grade professional staff, to permit a large scale retreat in the matter of materials assigned to one group, these ad hoc measures proved, in the opinion of the teachers, to be insufficient. At the suggestion of Mrs. Lomas, parents were enlisted to provide supplemental home instruction in the nature of vocabulary drill and to this end a vocabulary list and "flash card" teaching aids were sent home with the children.

In the early days of October, 1979, Dr. Burger, according to his testimony, received an unusually large number of telephone calls from parents expressing concern and displeasure with respect to the reading and mathematics programs at Weisenberg. On October 9, 1979, Dr. Burger met with Mrs. Lomas and Mr. Paul Bien, principal of Northwestern Elementary, to discuss the procedures used in grouping students for instructional purposes. Dissatisfied with the responses he received during the course of this discussion, Dr. Burger informed both principals that he would be assuming a more active role in the supervision of the elementary programs and would be visiting both schools in the near future. By memo to Dr. Burger dated two days later, Mrs. Lomas expressed her view that Dr. Burger's critical remarks were "completely out of line" and requested an oppor-

tunity to meet with the school board. At this time Mrs. Lomas also demanded that a written job description be prepared by the superintendent describing in detail the duties of her position.

Thereafter, Dr. Burger visited Weisenberg on several occasions in order to observe the various programs in operation, consulted individually with teachers on these occasions and, as a result of these observations and consultations, scheduled for the 16th and 22nd of October meetings with the kindergarten through third grade teachers and with the fourth through sixth grade teachers respectively. These meetings were conducted at the administrative offices and, although she was aware that they were taking place, Mrs. Lomas was not invited to the meetings and did not attend. At these meetings the professional staff of Weisenberg were invited to discuss with the superintendent their reservations concerning the program at that school as well as impediments they had experienced to maintaining a "positive teaching climate."

During the course of a public meeting of the board on October 17, 1979, Imogene Dietrich, the mother of a first grade student at Weisenberg, spoke at some length with regard to the difficulties she was facing in the attempt to carry out the program of home vocabulary drill instituted in September. In Mrs. Dietrich's opinion this program was ill-considered and seriously flawed in its conception because it relied on untrained parents to carry on the complex task of beginning reading instruction and because it asked parents to teach written vocabulary items before their children had received sufficient instruction in the constituent parts of those items; for example words containing the letters "c" and "h" in sequence were required to be taught at home by parents before

their children had received classroom instruction in the phonetic effect of the sequential combination of the symbols and their associated sounds. As a result, the main accomplishment of the program of home vocabulary instruction, in Mrs. Dietrich's experience, was frustration on the part of both parents and children. At this meeting of the school board Mrs. Lomas suggested that Mrs. Dietrich speak to the teacher involved and that she might profit from a visit to the school.

On October 19, 1979, nine members of the Weisenberg professional staff signed a letter addressed to Dr. Burger informing him,

that conditions exist in the Weisenberg school which act as deterrents to successful teaching. We regretfully submit that if these conditions cannot be changed within the near future, it is our intent to apply for building reassignment.

Mrs. Lomas was not informed at the time of this letter.

In the evening of October 30, 1979, Dr. Burger and the board met for several hours with a group of Weisenberg teachers and parents of children enrolled in that school to discuss the now controversial reading program as well as the similar innovations that had been instituted with respect to pupil grouping for mathematics instruction. Mrs. Lomas' conduct and performance of her duties as principal was also discussed at this meeting. The following day Mrs. Lomas was notified by Dr. Burger that, as she had requested, she was to address the board on November 2, 1979. At this meeting Mrs. Lomas criticized the manner in which Dr. Burger exercised his district wide authority, and expressed her concern with respect to what she perceived to be inconsistencies between the curricula and programs at the two elementary schools and between those of the elementary

schools and the junior and senior high schools. The board then questioned her on the matter of professional staff morale at Weisenberg as well as the programmatic concerns and reservations recently expressed by both parents and teachers.

On November 13, 1979, the board met in special session and, on the recommendation of Dr. Burger, resolved to appoint a committee of the board to investigate the performance of Mrs. Lomas as principal of Weisenberg and to request that she consider taking a paid leave of absence pending the conclusion of this investigation. One week later Mrs. Lomas met with the committee and, following a discussion of the complaints that had been raised concerning her conduct, refused to take a leave of absence.

On December 8, 1979, the board, again in special session and on the recommendation of the superintendent, voted unanimously to transfer Mrs. Lomas to the position of principal at Northwestern Elementary School with no reduction in salary or other benefits of employment. Three days later Mrs. Lomas reported to her new assignment at Northwestern and at 8:30 a.m. the entire complement of tenured professional staff at that school, in protest against her transfer, left the building and refused to return to their posts until approximately 11:30 a.m. The next evening the board, after separate, lengthy meetings with thirty-eight members of the Northwestern staff and with Mrs. Lomas, resolved to transfer the petitioner "to a teaching position within her field of certification effective January 2, 1980, and to follow the necessary legal procedures." Thereafter, by letter dated December 14, 1979, Mrs. Lomas received a written statement of the charges lodged against her related to her conduct as principal as well as a request that she consent to the proposed demotion and a state-

ment to the effect that should she fail to so consent she then had the right under the Public School Code of 1949 to a public hearing before the board in which evidence related to the charges would be presented. By letter dated December 27, 1979, Mrs. Lomas notified the board that she did not consent to the demotion and that she requested a hearing on the matter.

As we have indicated, at the close of the hearing the board voted to demote Mrs. Lomas to a classroom teaching position which action of the board was affirmed on appeal by the Secretary of Education. Where, as in this case, the Secretary has taken no additional evidence, this Court must review the decision of the school authorities to determine whether constitutional rights have been violated or an error of law committed, and whether the necessary factual findings of the board are supported by substantial evidence. *Strinich v. Clairton School District,* 494 Pa. 297, 431 A.2d 267 (1981).

The petitioner first argues that the procedure followed by the board in demoting her was defective as measured by the requirements of Sections 1127 and 1151 of the Public School Code of 1949, Act of March 10, 1949, P.L. 30, Article 11, *as amended,* 24 P.S. §§11-1127, 11-1151. Section 1151 provides in pertinent part that all non-consensual demotions of professional employees "shall be subject to the right to a hearing before the board of school directors and an appeal in the same manner as hereinbefore provided in the case of the dismissal of a professional employe." Section 1127, having to do with the procedure required to be followed in the case of dismissal provides:

Before any professional employe having attained a status of permanent tenure is dismissed by the board of school directors, such board of school directors shall furnish such pro-

fessional employe with a detailed written statement of the charges upon which his or her proposed dismissal is based and shall conduct a hearing. A written notice signed by the president and attested by the secretary of the board of school directors shall be forwarded by registered mail to the professional employe setting forth the time and place when and where such professional employe will be given an opportunity to be heard either in person or by counsel, or both, before the board of school directors and setting forth a detailed statement of the charges. Such hearing shall not be sooner than ten (10) days nor later than fifteen (15) days after such written notice. At such hearing all testimony offered, including that of complainants and their witnesses, as well as that of the accused professional employe and his or her witnesses, shall be recorded by a competent disinterested public stenographer whose services shall be furnished by the school district at its expense. Any such hearing may be postponed, continued or adjourned.

The petitioner contends that this procedure was not followed because the December 12, 1979, resolution of the board, by its terms, effected her demotion as of January 2, 1980—a date prior to the hearings in the matter. We agree that, generally, the demotion of a professional school employee may not become effective until after a hearing is held as required by Section 1151. *Tassone v. Redstone Township School District,* 408 Pa. 290, 183 A.2d 536 (1962); *Black v. Wyalusing Area School District,* 27 Pa. Commonwealth Ct. 176, 365 A.2d 1352 (1976). The Supreme Court, in a recent opinion in the case of *The School District of Philadelphia v. Twer,*    Pa.    ,    A.2d    (No. 361 Janu-

ary Term 1979, filed March 11, 1982) held that a hearing prior to demotion is not required when that demotion is made necessary by budgetary constraints on the school authorities, a prior hearing would be fiscally impossible to provide, and a fair subsequent hearing is held. However, the demotion of Mrs. Lomas was not motivated by budgetary considerations and there is no indication that the board could not have here provided a hearing prior to the effective date of the demotion. Therefore, we believe that *Twer* does not control the instant case and that the demotion of Mrs. Lomas was ineffective prior to the March 17, 1980 resolution of the board.

It does not follow, as the petitioner suggests, that we must order her to be reinstated. The procedure followed by the board with respect to its December 12, 1979 resolution, with the exception of its purported date of effectiveness, was in complete compliance with the dictates of the Public School Code and such case authorities as *Abington School Board v. Pittenger,* 9 Pa. Commonwealth Ct. 62, 305 A.2d 382 (1973). In *Abington* we described the proper procedure as containing the following elements:

The board only needed to have passed a resolution that it had sufficient evidence to support its belief to demote [the professional employee] by some given date, and therein direct the Secretary and President of the Board to serve notice upon [the professional employee] of this fact and to advise him of his right to a hearing.

*Id.* at 71, 305 A.2d at 387. Here the board passed a resolution expressing its intention to follow the legal procedures necessary to demote Mrs. Lomas. Thereafter, the petitioner was notified of this intended action, she was given a written statement, signed by the board president and attested by its secretary, of the charges against her and was notified of the time and

place when and where she would be given an opportunity to be heard on the charges. The hearings then held encompassed an exhaustive exploration of the relevant facts. Under these circumstances the petitioner is not entitled to be reinstated for the failure of the board to correctly set forth the effective date of her demotion. *Patchel v. Board of School Directors of Wilkinsburg School District,* 42 Pa. Commonwealth Ct. 34, 400 A.2d 229 (1979).

The petitioner next argues that she was deprived of her constitutionally protected right to due process of the law by the information gathering activities of a committee of the board, described at an earlier point in this opinion, prior to the public hearings in the matter.[2] We reject this contention. No relevant authority is cited for this proposition. Moreover, Section 1151 of the Public School Code expressly envisions that a professional employee may be requested to consent to a demotion and, if such consent is obtained, no hearing is required. We are at a loss to

---

[2] The petitioner also contends that she was not given proper or sufficient notification of Dr. Burger's dissatisfaction with the performance of her duties. It is clear that as early as October 9, 1979 the petitioner was the subject of criticism by the superintendent and that she responded to this criticism by memo dated October 11, 1979. Dr. Burger further testified that on November 19, 1979 he broached with the petitioner the subject of the mounting criticism by parents and teacherss of Weisenberg programs but that the petitioner was unreceptive to any discussion at that time. Thereafter, the petitioner was present during a number of board meetings where dissatisfaction with her professional conduct was discussed by parents, teachers, Dr. Burger, and members of the board. She was requested to take a paid leave of absence, to resign, and was transferred as principal to Northwestern Elementary. Prior to the demotion hearings she was given a detailed written statement of the charges against her. We reject the petitioner's argument that she was unaware of any dissatisfaction with her performance.

understand the means by which a board of school directors is to acquire the information it needs to determine whether to request consent to a demotion, thereby obviating the need for a hearing, if it is required to be unfamiliar with the facts prior to the hearing itself.

The basis of the petitioner's objection to the activities of the board prior to the hearing in her case seems to be that the hearings subsequently held were unfair because some or all of the board members had, assertedly, already formed a preconceived notion of the outcome. What is required of school directors in this regard was explicated by our Supreme Court in *Flannery Appeal*, 406 Pa. 515, 521, 178 A.2d 751, 754 (1962) where it wrote, quoting *Spruce Hill Township School District v. Bryner*, 148 Pa. Superior Ct. 549, 556, 25 A.2d 745, 748 (1948),

> The making of the charges presupposes that the members of the board had some knowledge of the facts upon which the charges were based. Unless they had an opinion that the charges, if sustained, would warrant dismissal, they should never have been made. That a member of the board had an opinion at the time the charges were preferred against appellant would not disqualify him from participating in a hearing on those charges, or invalidate the proceedings. We do not think that anything more was required of the members of the board than that they could hear and determine the charges against appellant on the evidence given before them, uninfluenced by other previous impressions.

From the record of these proceedings we are convinced that the petitioner had a thorough, fair, and impartial hearing. In addition, the petitioner has been represented throughout these proceedings by extreme-

ly able counsel who, in timely fashion, asserted every position supportive of her cause. There is no evidence that any member of the board was influenced by previous impressions of the matter at issue and, indeed, the board was instructed at some length by its specially appointed solicitor to confine all deliberations to the evidence admitted at the public sessions. The investigatory activities of the board committee were intended to and did in fact result in action taken with respect to the employment of Mrs. Lomas—a transfer without loss of pay to Northwestern Elementary—which was within the unfettered discretion of the board and which did not depend for its validity on the existence of charges or a public hearing. The board cannot now be faulted for the failure of this solution and the eventual necessity for the promulgation of charges related to a demotion.

The petitioner next argues that the evidence of record is insufficient to support the charges found against her. In this regard, thirteen public sessions were conducted by the board in January and February, 1980, and an exhaustive record was made of Mrs. Lomas' performance as principal in the Northwestern Lehigh School District. We have studied with great care each of the eighteen hundred and seventy-nine pages of the notes of testimony and the hundreds of pages of exhibits which include whole instructional texts and other lengthy and unedited curricular documents. The picture unmistakably created by this record is one of a principal who, despite the possession of superior academic qualifications, great personal commitment and concern for the students in her charge, and unexceptional motives, was unable as a result of her actions with respect to her subordinates to inspire the cooperative efforts of those teaching colleagues and, therefore, to perform the leadership functions for which she had been employed.

Nevertheless, Mrs. Lomas argues that the specific charges against her found by the board to have been sufficiently proved are, in fact, not supported by substantial evidence. The charges, from which as to each we have excluded the particular incidents of misconduct recited, are as follows:

> After due and careful consideration of the testimony presented and Exhibits produced at the several public hearing [sic] held between January 21, 1980 and February 28, 1980, in the matter of Bertie L. Lomas, the Board of School Directors of the Northwestern Lehigh School District find the following charges have been sustained by competent evidence:

> 1. During her tenure as principal of Weisenberg Elementary School, the professional employee pursued a policy of decision making, centralized in herself, and discouraging consultation and shared decision making with the professional staff at Weisenberg Elementary School, inter alia, as follows . . .

> 2. The professional employee failed and refused to effectively cooperate with other administrators in the Northwestern Lehigh School District with a view to promoting, developing, and maintaining an efficient, coordinated and effective educational program and cirriculum [sic] inter alia, as follows . . .

> . . . .

> 5. During her tenure as principal at Weisenberg Elementary School, the professional employee displayed a lack of sound administrative judgment and a lack of personal and emotional control and demeanor in dealing with subordinates, inter alia, as follows . . .

> . . . .

7. Beginning in the 1979-80 school year, the professional employee on her initiative and without consultation or collaboration with other professional employees initiated and instituted a reading curriculum and pupil placement, which was educationally unsound, demanded unrealistic levels of student accomplishment and resulted in student, teacher and parent disillusionment and frustration and further resulted in the need for extensive adjustments in student placement in reading group levels ...

8. At or about the beginning of the 1979-1980 school year, the professional employee caused to be instituted a curricula for mathematics study, which was educationally unsound, insensitive to the previous mathematical training of the individual student, unrealistic in its educational objectives and goals, and which resulted in student frustration, teacher, parent and student disillusionment, inter alia, as follows . . .
. . . .

16. On or about March, 1979, the professional employee, contrary to a directive of the Superintendent of Schools refused and otherwise failed to assign aides or teachers to supervise the loading and unloading of students on buses, which was contrary to the best interests, safety and welfare of the students at Weisenberg Elementary School.

. . . .

23. During her tenure as principal of the Weisenberg Elementary School, the professional employee was at various and diverse times uncompromising and arrogant in dealing with subordinates so as to intimidate, frustrate

and inhibit teachers and other staff members in the performance of their duties.

24. As a result of the attitudes, policies and conduct of the professional employee during her tenure as principal of the Weisenberg Elementary School, there has resulted an interference and interruption with the educational and administrative processes at the Weisenberg Elementary School and the elementary program at Northwestern Lehigh School District generally.

25. As a result of the attitudes, practices, policies and conduct of the professional employee during her tenure as principal of the Weisenberg Elementary School, faculty and administration relations have been substantially impared [sic] and eroded and faculty support for the administration and policies of the professional employee at Weisenberg Elementary School and at Northwestern Elementary School has disappeared.

For the purpose of this opinion it is not necessary that we give detailed consideration to the evidence adduced in support of each of these charges. Indeed, we agree with the petitioner that paragraph 16 of the charges reproduced above is not supported by the evidence.[3] However, we may not disturb the action of the elected school authorities in demoting a professional employee if that action, viewed in the light of the

---

[3] This charge relates to the alleged failure of the petitioner to carry out the directive of Dr. Burger, contained in a letter dated March 15, 1979, to secure an adult aide or teacher to supervise the loading of Weisenberg pupils onto school buses at the end of the day. Dr. Burger testified that another administrator in the district, Mr. John E. Reppert, had informed him by memorandum that Mrs. Lomas had not carried out this directive. Mr. Reppert did not

charges for which adequate evidentiary support is present, was "arrived at after a consideration of the educational needs of the school district rather than on any arbitrary or improper basis." *Smith v. Darby School District,* 388 Pa. 301, 315, 130 A.2d 661, 670 (1957).

The majority of the charging paragraphs allege, in various terms, that Mrs. Lomas by her inappropriate conduct and demeanor toward many members of the professional staff under her supervision caused those teachers to so avoid further contact and consultation with her as to destroy staff morale and render ineffective any concerted efforts to revise the educational program at Weisenberg. To this end Mrs. Rosemarie Mordaunt, a teacher of sixteen years experience and for five years a remedial reading instructor at Weisenberg, testified that Mrs. Lomas subjected her to a lengthy episode of verbal abuse including "screaming" and false accusations on the occasion of a misunderstanding with regard to the purchase of some twenty dollars of school supplies. A similar incident was sparked by an alleged misspelling contained in a notice sent home to parents and involved Mrs. Lomas and Mrs Marilyn Bower, for eight years a first grade teacher at Weisenberg. Mrs. Bower testified that the petitioner's emotional outburst on this occasion reached such proportions as to cause Mrs. Bower to suffer physical distress requiring her to leave her duties for the remainder of the day following, as she described it, repeated "badgering," "yelling," and "carrying on" by Mrs. Lomas.

Mrs. Beth Dymond testified that she had been severely "scolded" and subjected to public embarrass-

---

testify and Dr. Burger's testimony on this issue was hearsay and was objected to as such. Moreover, the uncontradicted testimony of the petitioner and two school district bus drivers was that Ms. Lomas and another teacher daily supervised the bus loading.

ment as the result of her well intentioned failure to comply with a directive concerning a pupil recess period. The inappropriate severity of the reprimand administered by Mrs. Lomas on this occasion was corroborated by the testimony of Mr. Dan Ziegler, a fellow teacher present at the time. Mrs. Miriam Haas, an eighteen year teaching veteran and the recipient of statewide accolades in her field further corroborated the testimony of Mrs. Dymond and proffered her opinion that these incidents alone and in combination with others of similar import had created an atmosphere at Weisenberg in which teachers were unwilling to communicate with their principal and were unable due to their low morale to effectively meet the instructional needs of the students.

Professional personnel for other schools in the district testified that Mrs. Lomas' conduct was disruptive of attempts to coordinate programs and course offerings between schools. Mr. John Achenbach, a high school social studies teacher, testified that during the course of a meeting between teachers at various grade levels held to discuss the coordination of instructional goals and activities

> Mrs. Lomas interjected her own opinion, and her own ideas on a number of occasions, disputed what we said, and the thing continued to get very heated and hot, tempers flared, and at one point she told us that if we didn't do things a certain way, that she would pick up and take her elementary teachers and leave, and they wouldn't be allowed to come back for another meeting.

Mr. Achenbach further testified that no additional meetings of this type were subsequently scheduled. Mr. Paul Bien, principal of Northwestern Elementary, recounted numerous examples of the conduct of Mrs. Lomas which had made more difficult the integration

of programs, including the federally funded Title I program, carried on in the two schools. On the matter of the petitioner's frequent emotionality Mr. Bien testified:

Well, on several occasions she would call me about some concern that she had and she was upset about something that I had done. And, we would get into a discussion about it. And, she would get quite upset, quite verbal, shouting, screaming at me about something that I had done that involved the other person that was sitting in the office. And, it made it quite embarrassing for me that I was being screamed at by her while there was somebody else sitting there.

Parents as well as teachers testified that Mrs. Lomas frequently expressed anger and displeasure inappropriate under the circumstances. Mrs. Linda Detrixhe and Mrs. Louise Megenhardt, whose sons were transported to Weisenberg by the same school bus, testified that when, following an incident on the bus which required disciplinary action with regard to the children, they approached Mrs. Lomas to solicit her advice as to what additional discipline ought to be administered at home, she responded in the following manner

And she—she just started screaming and yelling. She was banging her fists on the desk. And, she never really gave us a chance to tell her why we came in there. If she would have given us a chance to explain, I could have told her I just wanted to correct my son, if he had done something worse. But, she just kept screaming. I guess she thought we came in there against her. But I don't know.

Dr. Darlene Costello, mother of a second grader at Weisenberg, described a telephonic conversation with

Mrs. Lomas on the matter of a misunderstanding in which Dr. Costello requested of Mrs. Lomas that certain psychological tests be conducted by the school district with respect to her son Michael and, after waiting several months without receiving a definite reply, engaged the director of the reading program at Lehigh University to perform the tests. On the day of the tests at Lehigh University, of which the school had been previously informed, Dr. Costello received a written correspondence from Mrs. Lomas noting that Dr. Costello had failed to respond to an earlier request for written permission that Michael be tested by the district. In the course of the conversation initiated by Dr. Costello with Mrs. Lomas in an attempt to clarify the situation it was Dr. Costello's recollection that Mrs. Lomas responded as follows:

> I called Mrs. Lomas and said I would just like to keep her up to date with what was happening, that I had taken Michael to be tested on the day that she wrote the letter and that I would get the results from Lehigh to her.
>
> She told me that the school was concerned about my child, even if I was not concerned, that she was upset that I had not sent them a psychological permission slip back to the school, that they had more concern for my child than I did. She started to scream at me. I tried to explain to her that I indeed was concerned about Michael, that I had done what I thought was in his best interest . . . And, I just really wasn't able to converse with her because she screamed at me and made it difficult to talk.

Finally, Mrs. Linda Fenstermaker testified that she and her husband withdrew their child from Weisenberg following sharp questioning by Mrs. Lomas in the course of an interview scheduled by the Fenster-

makers to discuss their concern with regard to the grade advancement of their son Joel.

Mrs. Lomas' account of the incidents just summarized, although differing in some particulars and containing some reference to additional circumstances which, in her view, justified the behavior questioned, serves for the most part to reinforce the impression that she was frequently insensitive to the emotional and interpersonal dimension of her role as principal and to the effect on her colleagues and other members of the school community of her forceful and occasionally abrasive manner. Moreover, to the extent that Mrs. Lomas directly disputes the testimony of those who recounted these incidents it is clear that the board credited the testimony which supported the charges and it is not for this court to engage in a de novo assessment of the weight to be given to the evidence presented. Charging paragraphs 1, 5, 23, 24, and 25 are adequately supported by the evidence of record.

The remaining charges primarily concern innovations described above instituted by Mrs. Lomas with regard to the grouping of students for the purpose of instruction in reading and mathematics and in the assignment of various instructional materials to these groups. The evidence related to these charges is extremely complex and evidently encompassed certain graphic presentations and accompanying explanations before the board, the discussion of which in the transcribed notes of testimony, is very nearly incomprehensible. It is clear that these charges stand or fall on a determination of whether Mrs. Lomas accorded controlling weight in the grouping of students and in the distribution of instructional materials to certain standardized test results and, if the test results were so used, whether this practice is educationally sound. With regard to the method actually used in grouping the children and the part played by the test results

the evidence is conflicting. Mrs. Lomas testified that the test results were only one of three or four factors employed. Several teachers testified that their recollection of Mrs. Lomas' methodological explanation immediately following the completion of the grouping procedure was that the test results had been employed to the exclusion of other factors and that Mrs. Lomas' instructions to teachers performing at her direction the grouping of students for mathematics instruction was that only the test results were to be used. Other witnesses testified that their examination of the relevant data revealed that the test results had been controlling. Again, the resolution of this factual issue was for the board.

On the issue of whether student grouping and the assignment of instructional materials ought to have been based on the standardized test results here found to have been so employed, the expert testimony was again sharply divided. The board, on the basis of statements made in correspondence with the test publishers and on the testimony of Dr. Joseph P. Kender, professor of education at Lehigh University, concluded that the challenged practices were ill-advised. This conclusion is adequately supported by the record and, in turn, adequately supports charging paragraphs 7 and 8.

In the light of the testimony of these witnesses we cannot say that it was either improper or arbitrary for the board to determine that the district and its students would be better served if Mrs. Lomas were relieved of her supervisory and administrative responsibilities. "The maintenance of an efficient and competent school system has clearly been accepted as a valid reason for the demotion of an employee, and we will accept it here." *McCoy v. Lincoln Intermediate Unit No. 12,* 38 Pa. Commonwealth Ct. 29, 36, 391 A.2d 1119, 1123 (1978).

It must be noted that fourteen parents of children enrolled at Weisenberg, an elementary guidance counselor, an art teacher, a physical education teacher, two teacher's aides, a substitute teacher, two bus drivers, the head cook and cafeteria cashier for the elementary school, a janitor, and Mrs. Lomas's personal secretarial staff testified that they held Mrs. Lomas in the highest regard and had experienced with her none of the interpersonal conflicts described by others. The petitioner invites us, on the basis of this testimony in her defense, to disregard the testimony which was less supportive of her position. We must decline this invitation and reemphasize that the legislature and the citizens of the Northwestern Lehigh School District have entrusted the ultimate administration of the Weisenberg school to the board of school directors whose judgment as to the seriousness of Mrs. Lomas' failings as well as its assessment and resolution of conflict in the testimony will not be disturbed by this court.

[A] court is not a super board of directors with superior knowledge of the administration of business, finance or the science of pedagogics. It would be presumptuous to superimpose judicial control upon the exercise of discretion by trained educators.

*Smith v. Darby School District, supra,* 388 Pa. at 315, 130 A.2d at 669.

Order affirmed.

### Order

And Now, this 7th day of May, 1982, the order of the Secretary of Education in the above-captioned matter upholding the action of the Board of School Directors of the Northwestern Lehigh School District demoting Mrs. Bertie L. Lomas is modified so as to provide that Mrs. Lomas' salary and benefits as prin-

cipal of Weisenberg Elementary School not be decreased or diminished during the period before March 17, 1980, on which date, after hearing, the Board of School Directors demoted her to a classroom teaching position; as so modified, the order is affirmed.

This decision was reached prior to the resignation of Judge MENCER.